T.C. Memo. 1998-215


UNITED STATES TAX COURT


RONALD I. AND LOIS B. KOENIG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1468-96.                    Filed June 17, 1998.


<u>Patrick Derdenger</u>, for petitioners.

<u>John W. Duncan</u>, for respondent.


MEMORANDUM OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies in, additions to, and penalties on petitioners' Federal income taxes as follows:

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1) | Penalties Sec. 6662(a) |
|------|-----------|------------------------|------------------|
| 1990 | $167,792 | $4,160 | $33,558 |
| 1991 | 16,536 | 1,445 | 3,307 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. References to petitioner are to Ronald I. Koenig.

After concessions,[1] the issues for decision are: (1) Whether for 1990 petitioners are entitled to a business bad debt deduction relating to their disposition of the Washington Chocolate Co. (Washington Chocolate). We hold they are not. (2) Whether for 1990 petitioners are entitled to deductions for activities involving ancient artifacts. This turns on whether petitioners were actively engaged in a trade or business during 1990. We hold petitioners were not engaged in a trade or business during 1990 and are not entitled to the deductions. (3) Whether for 1990 petitioners' net loss for their rental real estate activity is limited to $25,000. We hold it is. (4) Whether for 1990 petitioners are liable for an addition to tax pursuant to section 6651(a)(1) for delinquent filing of a return. We hold they are. (5) Whether for 1990 petitioners are liable for a penalty pursuant to section 6662(a) for negligence or disregard of rules or regulations. We hold they are not.

---

[1] The parties settled all issues relating to taxable year 1991 before trial.

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference.  At the time the petition in this case was filed, petitioners resided in Paradise Valley, Arizona.

For convenience, we combine our findings of fact with our opinion under each separate issue heading.[2]

Issue 1.  Bad Debt

Respondent determined that for 1990 petitioners were not entitled to a $500,000 business bad debt deduction related to their disposition of Washington Chocolate.

Section 166 entitles a taxpayer to a deduction for a bad debt that becomes worthless during the taxable year.  A business bad debt can be deducted from ordinary income if it is either partially or totally worthless.  Sec. 166(a).  Only a bona fide debt is deductible.  Sec. 1.166-1(c), Income Tax Regs. Petitioners bear the burden of proving that a bona fide business debt exists and that the debt became worthless during the taxable year in issue.  Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981); Rude v. Commissioner, 48 T.C. 165, 172 (1967).

From July 25, 1986, until May 26, 1989, petitioners were the sole shareholders of Washington Chocolate, a subchapter S

---

[2] We have considered each of the parties' arguments and, to the extent that they are not discussed herein, find them to be unconvincing.

corporation. Washington Chocolate was in the business of providing bulk food products which would be placed in and sold from bins located in supermarkets and other retail establishments. Washington Chocolate manufactured and distributed various snack foods and confectionary goods, including trail mixes, coated nuts, dried fruits, and chocolate, yogurt, and carob products.

Before petitioners acquired Washington Chocolate, the company was close to bankruptcy. Before purchasing Washington Chocolate, petitioner created a new business plan for the company and renegotiated credit and loan terms with the company's major creditors.

At the time petitioners purchased Washington Chocolate, the company had only one significant customer and a downward annual sales trend. Petitioner increased the value of Washington Chocolate by creating and patenting a new product dispensing system which distinguished Washington Chocolate from its competitors. Under petitioners' ownership and management, Washington Chocolate's customer base expanded and annual sales increased substantially.

A primary competitor of Washington Chocolate was Harmony Foods, Inc. (Harmony Foods), whose president was Robert Lynch (Lynch). On May 26, 1989, Washington Chocolate entered into an asset purchase agreement (purchase agreement) with Harmony Foods,

under which Harmony Foods purchased all of the assets of Washington Chocolate and certain other specified assets of petitioner. Harmony Foods' primary interest in this transaction was obtaining Washington Chocolate's customer base.

Pursuant to paragraph 2.1 of the purchase agreement, Harmony Foods paid $600,000 to Washington Chocolate for its assets and an additional $71,000 to petitioner for those assets he owned personally. Paragraph 10.4 of the purchase agreement provided that as a condition precedent, petitioner was to execute an employment agreement with Harmony Foods. Consistent with the requirements of paragraph 10.4 of the purchase agreement, petitioner entered into an employment agreement with Harmony Foods on May 26, 1989, which provided for the employment of petitioner by Harmony Foods.

Paragraph 2 of the employment agreement defined petitioner as an at-will employee. Paragraph 3 of the employment agreement defined the term of employment as commencing on the date of signing the employment agreement and continuing until either party terminated the employment agreement with 30 days' written notice.

Paragraph 4.A of the employment agreement provided petitioner with an annual base salary of at least $100,000. As additional compensation, paragraph 4.B of the employment agreement provided petitioner with a commission over a 7-year

period beginning May 1, 1989, based on a percentage of net sales. The employment agreement stated that the aggregate commission for that period would be a minimum of $200,000 and a maximum of $900,000. In addition, paragraph 5 of the employment agreement set forth a noncompete agreement, under which Harmony Foods agreed to pay petitioner $500,000.

Paragraph 12.E of the employment agreement provided that it would be construed and enforced in accordance with the laws of the State of Washington. Petitioner participated in the negotiation of the purchase agreement and employment agreement and personally executed these documents. Lynch was not involved in the drafting of these documents.

After Harmony Foods and petitioner executed the employment agreement, petitioner began serving as an employee of Harmony Foods. Petitioners subsequently changed the name of Washington Chocolate to RLK Management, Inc., and in August 1989 liquidated that corporation.

On May 31, 1990, MEI Diversified, Inc. (MEI), the parent corporation of Harmony Foods, sold Harmony Foods to Glico Harmony Foods Corp. (Glico). In connection with this sale, Glico, Harmony Foods, and Glico U.S.A., Inc., the parent corporation of Glico, entered into an assumption agreement under which Glico assumed all of Harmony Foods' obligations under the employment agreement, except for those relating to the noncompete agreement.

In connection with the sale of Harmony Foods to Glico, petitioner, Harmony Foods, and MEI entered into an agreement accelerating the amounts due as minimum commission and noncompete payments. Before the sale of Harmony Foods to Glico, petitioner received $200,000 as commissions pursuant to paragraph 4.B of the employment agreement and $500,000 in noncompete payments.

During June, July, and August 1990, petitioner attempted to collect additional commissions. When he contacted MEI he was told to speak with Glico, and when he contacted Glico, he was told to speak with MEI. In mid-December 1990, petitioner was informed during a meeting with Yasuaki Aoki, the Chief Executive Officer of Glico, that Glico would not make any further payments to him pursuant to paragraph 4.B of the employment agreement. Petitioner's employment with Glico was terminated shortly after this meeting.

Petitioners claimed a $500,000 bad debt deduction on a Schedule C attached to their 1990 Federal income tax return based on petitioner's failure to receive any more than $200,000 pursuant to paragraph 4.B of the employment agreement.[3] Respondent disallowed the deduction. We agree with respondent.

---

[3] Petitioner did not claim the entire $700,000 difference between the minimum payment received and the maximum payment allowable because at that time he believed he might be able to collect additional commission payments.

Petitioners ask the Court to ignore the plain meaning of the language chosen by the parties to the purchase agreement and the employment agreement. Petitioners argue that, in form, part of the sale price of Washington Chocolate was allocated among a noncompete payment and commissions; however, they argue that the substance of the deal was that all payments received by petitioner were for the assets of Washington Chocolate. Therefore, petitioners claim the asset sale price should be read as follows: $600,000 in cash, $500,000 for a noncompete payment, and $900,000 for commissions payable for 7 years, for a total sale price of $2 million.

Petitioners argued at trial and on brief that although the purchase price was allocated as outlined above, the intent of the parties was an asset sale. At trial, Lynch, the former president of Harmony Foods, testified that the sale of Washington Chocolate to Harmony Foods was understood to be an asset sale. Lynch was interested primarily in one asset, which was Washington Chocolate's customer list.

If this transaction was merely as asset sale, as petitioners claim, we fail to see why the payments were structured as outlined above. The logical explanation is that the payments were not just for the assets of Washington Chocolate. Both petitioner and Lynch testified that the industry in which they were involved was extremely competitive, and the two had

continually bid against each other for contracts with supermarkets and other retailers. Lynch also testified that a major reason Harmony Foods acquired Washington Chocolate was to consolidate the industry and eliminate competition. With this in mind, it is very clear that the $500,000 allocated to the noncompete clause was intended for that purpose and not as payment for the assets of Washington Chocolate.

Petitioner became an employee of Harmony Foods after he sold Washington Chocolate, and subsequently an employee of Glico. Lynch testified that he intended to work with petitioner after Washington Chocolate was sold to Harmony Foods. The purpose of petitioner's employment with Harmony Foods was to assist in distributing some of Harmony Foods' products to petitioner's customers, and some of petitioner's products to Harmony Foods' customers. Lynch testified that petitioner's presence after the sale of Washington Chocolate helped with the transition of customers. The commission payments petitioner received pursuant to paragraph 4.B of the employment agreement were in connection with his status as an at-will employee and his assistance with the customer transition. Paragraph 4.B provided that the commissions were based on a percentage of net sales, and that petitioner was entitled to the commissions whether or not he was responsible for generating the sales. The minimum and maximum aggregate commissions payable for the 7-year period pursuant to

the employment agreement were $200,000 and $900,000,

respectively. Petitioner received payment of $200,000 before his

status as an at-will employee was terminated. Any amount above

the $200,000 minimum was to be based on net sales.[4] A valid debt

did not exist for the remaining $700,000.

Moreover, respondent claims that even if petitioners were

owed an additional amount under paragraph 4.B of the employment

agreement, they still would not be entitled to a bad debt

deduction. We agree. The regulations state that

> Worthless debts arising from unpaid wages, salaries,
> fees, rents, and similar items of taxable income shall
> not be allowed as a deduction under section 166 unless
> the income such items represent has been included in
> the return of income for the year for which the
> deduction as a bad debt is claimed or for a prior
> taxable year. [Sec. 1.166-1(e), Income Tax Regs.]

The commissions received pursuant to the employment

agreement, like wages or salary, were ordinary income. Thus,

since petitioners did not report any of the commissions alleged

to be owed as income in 1990 or in a prior year, they cannot

claim these unpaid commissions as a bad debt deduction for 1990.

------

[4] Pursuant to par. 6.B of the employment agreement, the commissions payable to petitioner under par. 4.B were to survive the termination of his employment. Petitioner argues that this means he is entitled to the full $900,000. By the terms of the employment agreement, $900,000 is the maximum commission payable, not the amount required to be paid. As stated previously, any amount received over the $200,000 minimum was to be based on a percentage of net sales. Petitioners did not provide any information regarding net sales by which to determine whether an additional commission payment was due.

Accordingly, respondent is sustained on this issue.

Issue 2. Ancient Artifacts Business

Respondent determined that the claimed deductions for petitioner's ancient artifacts activities were startup expenses pursuant to section 195 and therefore not deductible since they were not related to an active trade or business. Petitioner asserts that he was in the business of dealing in ancient artifacts during 1990.

Section 162(a) allows a deduction for ordinary and necessary expenses of carrying on a trade or business. In order for expenses to be deductible under section 162, they must relate to a trade or business functioning at the time they are incurred. Hardy v. Commissioner, 93 T.C. 684, 687 (1989). Startup or preopening expenses are not currently deductible under section 162. Id.

Section 195(a) generally disallows all deductions for startup expenditures. Startup expenditures are defined as amounts paid or incurred in connection with: (1) Investigating the creation or acquisition of an active trade or business, (2) creating an active trade or business, or (3) any activity engaged in for profit in anticipation of the activity's becoming an active trade or business. Sec. 195(c)(1)(A). Second, these costs must be the type of costs that would be currently deductible if paid or incurred in connection with the operation

of an existing trade or business in the same field as that entered into by the taxpayer. Sec. 195(c)(1)(B).

After petitioner sold Washington Chocolate, he decided he wanted to become an ancient artifacts dealer. Petitioner had developed an interest in ancient artifacts during childhood and had built a substantial personal collection.

In the fall of 1989, petitioner traveled to Sedona, Arizona, and purchased his first artifact for his commercial inventory from Donald Corsette (Corsette). Throughout 1990, petitioner made frequent trips to Sedona and made several purchases from Corsette. In December 1990, petitioner traveled with Corsette to Geneva, Switzerland, where he purchased additional artifacts from Phoenix Ancient Art.

Petitioner testified that when dealing in ancient artifacts, having a gallery bolsters a dealer's credibility. Therefore, during 1990 petitioner began to look for retail space in and around the Union Square area of San Francisco in which he could operate a gallery for his ancient artifacts. Petitioner located acceptable retail space in San Francisco, negotiated a lease, received drawings, and met with contractors who would construct leasehold improvements on the space. The plan for a San Francisco gallery was abandoned, however, because petitioner did not have sufficient inventory for the gallery space. Instead, petitioner decided he would operate his gallery from his personal

residence, which at that time was located in Santa Cruz, California.

Petitioner claims that his ancient artifacts activities were an active trade or business during 1990.  We disagree. Petitioner testified that his inventory was available for sale during 1990.  The mere fact that petitioner would have sold items in his inventory if approached by a buyer, however, does not mean that the activity rose to the level of an active trade or business.  Kennedy v. Commissioner, T.C. Memo. 1973-15 ("the ability to transact business does not satisfy the 'carrying on' requirement of [section 162]"); see also Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded per curiam on other grounds 382 U.S. 68 (1965).

Petitioner also testified that he had a business plan for his ancient artifacts activities.  According to this business plan, during 1990, petitioner testified that "I wasn't out beating on doors, * * * I was doing what I had planned to do which was to build up [the] inventory."  Furthermore, petitioner testified that starting a business like this requires a tremendous amount of preparation work, including locating buying sources and other general business considerations, and that he spent longer than a year accumulating his inventory.

In addition, despite the fact that selecting a name for his business was "very important", petitioner did not file his fictitious business name statement with the State of California, indicating the name under which he planned to conduct his ancient artifacts business, until May 7, 1991. Petitioner testified that it was not until that time that he satisfied the criteria for his business plan, which included accumulating a certain amount of inventory.

Petitioner was not actively involved in an ancient artifacts trade or business during 1990. Instead, he was accumulating the necessary inventory and developing the reputation he would need to conduct the business. At trial, petitioner stressed the amount of preparation required to conduct this type of business, yet he acquired his first piece of inventory only in the fall of 1989. Although lack of sales is not dispositive, petitioner made no sales of ancient artifacts in 1990. The rational explanation for his failure to make any sales is that he was not conducting an active trade or business during 1990, as he did not yet have sufficient inventory or a commercial gallery. Furthermore, according to petitioner's testimony, he was not conducting any type of sales activity.

Accordingly, respondent is sustained on this issue. Petitioner's 1990 expenses related to ancient artifacts are startup expenses pursuant to section 195.

Issue 3.  Net Loss for Rental Real Property

Respondent determined that petitioners' net loss for rental real property in 1990 is limited to $25,000.  Petitioners assert that they are not limited by the $25,000 rental loss allowance and that they are entitled to deduct $57,975, the full amount of their loss.

During 1990, petitioners owned five separate parcels of rental real property.  Four of the properties were located in Scottsdale, Arizona (the Scottsdale properties), and one was located in Sumner, Washington (the Sumner property).  The Scottsdale properties, which comprised two townhomes and two condominiums, were upscale, resort-oriented properties with numerous amenities.  The Sumner property was a lakefront single-family dwelling with an unobstructed view of Mt. Rainier.

Lois B. Koenig (Mrs. Koenig) personally conducted the leasing activities for the Sumner property.  Petitioners engaged Racquet Club Realty to act as a rental broker to locate tenants for the Scottsdale properties.

Mrs. Koenig was responsible for the management, maintenance, and operation of the rental properties.  Her responsibilities included collecting rents and arranging for necessary repairs. In addition, when tenants moved out, it was necessary to clean and sometimes paint the rental properties before new tenants

arrived.  Mrs. Koenig would sometimes perform these tasks herself or would make arrangements for the services to be performed.

Petitioners assert that they are entitled to the full amount of the rental loss because they were actively engaged in the trade or business of renting real property.  Accordingly, they argue their loss is fully deductible under section 162 because the expenses were incurred in their rental property trade or business.[5]

Section 162(a) provides in relevant part that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  The regulations promulgated thereunder state that only those ordinary and necessary business expenses "directly connected with or pertaining to the taxpayer's trade or business" may be deducted.  Sec. 1.162-1(a), Income Tax Regs.

Section 469(a) generally disallows all passive activity losses.  The term "passive activity" includes any rental activity.  Sec. 469(c)(2).  Section 469(i) provides an exception, however, to this complete disallowance.  Section 469(i) allows a taxpayer who "actively participates" in a rental activity to

_____

[5]    Petitioners originally argued that they were entitled to the full amount of the claimed loss pursuant to sec. 469(c)(7).  The year in issue is 1990.  Sec. 469(c)(7) did not become effective until taxable years beginning after Dec. 31, 1993.  See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13143(a), 107 Stat. 312, 440.

claim a maximum loss of $25,000 per year related to the rental real estate.[6]

The general provisions for deductibility of ordinary and necessary business expenses under section 162 must be read in conjunction with the passive activity loss rules of section 469. These sections must be construed together with more specific provisions prevailing over general ones. Cf. United States v. Estate of Romani, 523 U.S.__, 118 S. Ct. 1478 (1998). Petitioners cannot completely circumvent the passive activity loss rules merely by asserting that they are in the trade or business of renting real estate.

Accordingly, respondent is sustained on this issue, and petitioners' net loss for rental real property for 1990 is limited to $25,000.

Issue 4. Addition to Tax Under Section 6651(a)

Respondent determined an addition to tax under section 6651(a) for delinquent filing of a return.

Petitioners were required to file their 1990 Federal income tax return by October 15, 1991. Petitioners provided a certified mail receipt indicating that their return was mailed on October

---

[6] This exemption provided in sec. 469(i) is phased out for taxpayers whose adjusted gross income is greater than $100,000. Sec. 469(i)(3)(A). Respondent did not seek to invoke the phaseout, and so we do not address the issue.

15, 1992. Therefore, petitiioners' return is deemed timely mailed/timely filed. Sec. 7502. Respondent concedes this issue.

Issue 5. Penalty Under Section 6662(a)

Respondent determined that petitioners' underpayment of tax for 1990 was due to negligence or disregard of rules or regulations, subjecting them to the accuracy-related penalty of section 6662(a).

Section 6662 provides for an accuracy-related penalty equal to 20 percent of the portion of the underpayment due to negligence or disregard of rules or regulations. For purposes of section 6662, negligence "includes any failure to make a reasonable attempt to comply with the * * * [income tax laws]" and disregard "includes any careless, reckless, or intentional disregard." Sec. 6662(c).

When petitioners acquired Washington Chocolate, the company was performing poorly and close to bankruptcy. Through his business plan and innovation, petitioner increased both the company's sales and its value. We accept that as a result of his efforts petitioner had a good faith belief that he was entitled to additional commission payments. We also accept that petitioner was sent back and forth between Glico and MEI when he attempted to open discussions about additional payments. This, however, does not change the fact that petitioners are not entitled to a bad debt deduction.

Petitioners relied on advice from Philip Silbering (Silbering), a certified public accountant, in connection with the preparation of their 1990 Federal income tax return. Petitioner had telephone conversations with Silbering and explained the circumstances of the sale of Washington Chocolate. Silbering advised petitioner that it would be appropriate to take a bad debt deduction for the unpaid commissions.

Silbering also advised petitioner to prepare an explanation of the bad debt deduction and include it with his return. Petitioner prepared this explanation and attached it to petitioners' 1990 Federal income tax return.

When an accountant provides advice to a taxpayer on a matter of tax law, it may be reasonable for the taxpayer to rely on that advice. United States v. Boyle, 469 U.S. 241, 251 (1985); Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264. Petitioners' reliance on Silbering's advice regarding the bad debt was reasonable. Moreover, the circumstances were disclosed. In addition, we find the other issues resulting in petitioners' deficiency to be good faith misinterpretations of the Internal Revenue Code.

Accordingly, petitioners are not liable for the accuracy-related penalty pursuant to section 6662(a).

For the foregoing reasons,

<u>Decision will be entered</u>

<u>under Rule 155.</u>