T.C. Memo. 2018-147

UNITED STATES TAX COURT

JEFFREY B. YAPP AND TAMARA A. YAPP, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13805-14.                         Filed September 10, 2018.

<u>Bertram Paul Husband</u>, <u>Richard Warren Craigo</u>, and <u>Jeffrey M. Wong</u>, for petitioners.

<u>Paulmikell A. Fabian</u>, <u>Mark A. Nelson</u>, <u>Sarah A. Herson</u>, and <u>Amy B. Ulmer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined a $475,135 deficiency and a $95,027 section 6662(a) accuracy-related penalty with respect to petitioners' Federal income tax for 2010.  After concessions, the issues for decision are:

[*2] (1) whether payments made for legal and professional services and wage payments are deductible as expenses of a business operated by Jeffrey B. Yapp (J. Yapp), (2) whether payments and other reported expenses are deductible as expenses of a business operated by Tamara A. Yapp (T. Yapp, and together with J. Yapp, petitioners), and (3) whether petitioners are liable for the section 6662(a) accuracy-related penalty. All section references are to the Internal Revenue Code in effect for 2010, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Oregon when they filed their petition.

NXTM, LLC

J. Yapp was an employee of MTV Networks (MTV) from 2004 until 2009. During his employment at MTV, he was involved in the development of a web-based promotional platform for music artists (platform). At some point in 2009, MTV decided not to pursue further development of the platform, and J. Yapp asked MTV to allow him to continue developing the platform on his own.

**[*3]** On July 16, 2009, J. Yapp formed NXTMUSIC, LLC, as a single-member Delaware limited liability company. The company's name was changed to NXTM, LLC (NXTM), on August 5, 2009. On that same date J. Yapp executed NXTM's first operating agreement. On August 31, 2009, NXTM entered into an assignment agreement (assignment) with MTV under which NXTM received the rights to the platform in exchange for repaying MTV's prior investment and development costs and paying MTV royalties from future sales. Following this assignment MTV employees associated with the platform worked for NXTM.

NXTM used the platform to operate as a musical artist promotional company. Taylor Swift was the principal musical artist promoted on the platform. To fund further development of the platform NXTM pursued a two-phase investment strategy. The first phase included raising funds from friends and family; the second phase was to pursue institutional investors.

As J. Yapp carried out his investment strategy for NXTM, he amended its LLC operating agreement several times. J. Yapp executed an agreement dated January 1, 2010, that amended and restated NXTM's first operating agreement in preparation for the company to start the institutional investment phase. No additional members were added to NXTM through this agreement. In February 2010 J. Yapp negotiated attorney's fees NXTM owed to a reduced amount totaling

[*4] $120,000 for work previously performed for NXTM, and he paid the fees out of NXTM's bank account. On March 18, 2010, NXTM's operating agreement was further amended to add 2 "Class A Common Members" and 17 "Series A Preferred Members". The new members included individuals who contributed funding during the friends and family investment phase. On September 16, 2010, NXTM's operating agreement was amended to add its institutional investors as members.

Real Food Real Life, LLC

During 2009 and 2010 T. Yapp worked to establish her own health food business. T. Yapp had been introduced to probiotic supplements during her efforts to find treatments for medical conditions suffered by petitioners' son. T. Yapp began working with an Australian company called A.G.M. Foods Pty. Ltd., doing business as Grainfields (AGM), whose fermented probiotic supplements she had used previously. T. Yapp believed that, if she incorporated AGM's unpleasant tasting supplements into better tasting products, there was an opportunity to market and sell probiotic supplements in the United States. On January 1, 2009, T. Yapp entered into a distribution agreement (distribution agreement) with AGM. Under its terms AGM would help T. Yapp develop her own line of probiotic products in exchange for T. Yapp's marketing and selling AGM's supplements in the United States. In October 2009 T. Yapp formed Real Food Real Life, LLC

[*5] (RFRL), as a single-member California limited liability company to pursue this opportunity.

Throughout 2009 and 2010 T. Yapp worked to develop RFRL's product line. She worked to formulate new recipes that incorporated AGM's supplements to achieve products with better taste, texture, and shelf life. When T. Yapp developed a workable recipe, she sent it to AGM, and AGM would use her recipe to produce a commercial-level product trial run. AGM then sent samples of the trial run products to T. Yapp. T. Yapp used the product samples to refine further RFRL's products by conducting focus groups and giving the samples away in exchange for feedback. She also wrote and posted articles on RFRL's website, recorded a video presentation for Whole Foods, and met with numerous doctors and experts to promote RFRL.

T. Yapp took steps to launch RFRL's product line commercially. She hired designers to create RFRL's logo, slogan, and product labels. Together with her daughter and brother-in-law, she researched options for shipping RFRL's products. T. Yapp also restructured RFRL in order to separate RFRL-branded products from her anticipated non-health food product lines. In May 2010 she formed Fermactive, LLC, as a single-member Delaware limited liability company

[*6] that would serve as a parent company with separate divisions for RFRL and other products.

In November 2010 AGM obtained certifications that the RFRL-branded products it produced were Kosher, Pareve, and organic. During the month of December 2010, T. Yapp solicited and received pre-orders of RFRL products. The first shipment of finished RFRL-branded products arrived in the United States in late December 2010. The products sustained damage during shipment that delayed their ultimate delivery to RFRL. RFRL officially launched its products at a party hosted by NXTM on February 25, 2011.

Tax Reporting for 2009 and 2010

Petitioners used the same certified public accountant (C.P.A.) to prepare and jointly file their Forms 1040, U.S. Individual Income Tax Return, for 2009 and 2010. Petitioners provided their C.P.A. with only the general ledgers their bookkeeper kept to record income and expenses for NXTM, RFRL, and their household. For both years petitioners treated their respective businesses, NXTM and RFRL, as disregarded entities for tax purposes and included Schedules C, Profit or Loss From Business, with their jointly filed Forms 1040. Though NXTM kept its books using the accrual method of accounting, petitioners filed their 2009 income tax return using the cash method on the Schedule C prepared for NXTM.

[*7] For 2009 petitioners reported net negative income of $559,179. For 2010 they claimed a net operating loss (NOL) carryover of $557,423 from 2009. Petitioners' 2010 return included personal expenses as part of RFRL's business deductions and failed to continue to take depreciation deductions claimed for 2009.

The Internal Revenue Service (IRS) conducted an examination of petitioners' returns for 2009 and 2010. As a result, the IRS determined adjustments to petitioners' 2009 gross income that increased it from –$559,179 to $284,785. These adjustments included the disallowance of $122,737 claimed as part of a deduction for NXTM's wage expenses paid for 2009. The IRS also disallowed $120,000 claimed as part of a deduction for legal and professional services expenses for NXTM. These expenses were actually paid in 2010. The IRS also disallowed all deductions claimed for RFRL-related expenditures.

The IRS adjustments did not result in a deficiency for petitioners' 2009 taxable year. The IRS disallowed in full petitioners' $557,423 NOL carryforward for 2010. On March 28, 2013, the group manager for the IRS examiner executed a Civil Penalty Approval Form (penalty approval form) approving the section 6662(a) and (b)(2) underpayment penalty for a substantial understatement of income tax that was determined in the notice of deficiency dated March 17, 2014.

**[*8]**                                         OPINION

I.     Business Expense Deductions

Taxpayers are required to maintain sufficient records to establish the

amount and purpose of any deduction.  Sec. 6001; Higbee v. Commissioner, 116

T.C. 438, 440 (2001); sec. 1.6001-1(a), (e), Income Tax Regs.  The taxpayer has

the burden of proving entitlement to his or her deductions claimed.  See New

Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Rockwell v.

Commissioner, 512 F.2d 882, 886 (9th Cir. 1975), aff'g T.C. Memo. 1972-133.

This includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C.

87, 90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

Section 162(a) allows as a deduction "all the ordinary and necessary

expenses paid or incurred during the taxable year in carrying on any trade or

business".  An expense is ordinary if it is normal, usual, or customary in the

taxpayer's trade or business, and it is necessary if appropriate or helpful for such

business.  See Deputy v. du Pont, 308 U.S. 488, 495 (1940); see also Lingren v.

Commissioner, T.C. Memo 2016-213.

A taxpayer is not carrying on a trade or business for section 162(a) purposes

until the business is functioning as a going concern and performing the activities

for which it was organized.  Richmond Television Corp. v. United States, 345 F.2d

[*9] 901, 907 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965); see also Glotov v. Commissioner, T.C. Memo. 2007-147. Business operations with respect to the activity must have actually commenced. See McKelvey v. Commissioner, T.C. Memo. 2002-63, aff'd, 76 F. App'x 806 (9th Cir. 2003). "Until that time, expenses related to that activity are not 'ordinary and necessary' expenses currently deductible under section 162 * * * but rather are 'start-up' or 'pre-opening' expenses." See Woody v. Commissioner, T.C. Memo. 2009-93, slip op. at 9-10 (citing Hardy v. Commissioner, 93 T.C. 684, 687-688 (1989), aff'd in part, remanded in part, 1990 U.S. App. Lexis 19670 (10th Cir. Oct. 29, 1990)), aff'd, 403 F. App'x 519 (D.C. Cir. 2010). Startup expenses, although not deductible during the pre-opening phase, may generally be deducted or capitalized and deducted over time upon a taxpayer's becoming actively engaged in business pursuant to section 195. Sec. 1.195-1T, Temporary Income Tax Regs., 73 Fed. Reg. 38910 (July 8, 2008).

## A. NXTM

### 1. Legal and Professional Services

Petitioners concede that respondent properly disallowed the NXTM Schedule C deductions claimed for legal and professional services for 2009. They nonetheless argue that legal fees of $120,000 paid by NXTM in February 2010 are

[*10] deductible from their 2010 gross income. Respondent's position is that since NXTM became a multimember LLC in 2010 it should be treated as a partnership for tax purposes. According to respondent, J. Yapp failed to substantiate that his outside basis in his NXTM partnership interest was sufficient to allow him to deduct the full amount of the legal fees paid.

J. Yapp testified at trial that when NXTM paid the legal fees in February 2010 it was still a single-member LLC. He further testified that NXTM did not admit new members until March 2010. The NXTM operating agreement and subsequent amendments in evidence support J. Yapp's testimony that NXTM remained a single-member LLC until the second amendment to the operating agreement was executed in March 2010. A single-member LLC is disregarded as an entity separate from its owner for Federal income tax purposes unless it elects otherwise. See secs. 301.7701-2(a), 301.7701-3(b)(i) and (ii), Proced. & Admin. Regs. Petitioners also provided evidence that NXTM paid $120,000 for legal fees in 2010, including company emails negotiating the reduction and payment of legal fees owed, bank statements showing wire transfers from NXTM's account, and a copy of a cleared electronic check drawn on NXTM's account. These documents, coupled with J. Yapp's testimony, are credible evidence that NXTM paid legal fees of $120,000 during February 2010 and that at the time of payment NXTM

**[\*11]** was a single-member LLC and therefore a disregarded entity. Since NXTM was not a partnership at the time the legal fees were paid, J. Yapp is not required to substantiate his outside basis in his NXTM partnership interest in order to deduct the full amount of the legal fees paid. Cf. sec. 704(d). We conclude that petitioners are entitled to a deduction of $120,000 for these expenses.

### 2. Wages

Petitioners contend that respondent improperly disallowed $122,737 of a deduction for wages claimed on their 2009 return for NXTM, which was part of the NOL carryover claimed for 2010. Respondent disallowed this portion of the wage deduction claimed for NXTM for lack of substantiation. While 2009 is not a year in issue in this case, we may determine the correct amount of NOL for a year not in issue as a preliminary step in determining the correct amount of an NOL carryover to a taxable year in issue. Sec. 6214(b); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 274-275 (1990). Deductions may include a reasonable allowance for salaries or other compensation for services actually rendered. Compensation is deductible under section 162(a)(1) only if it is (1) reasonable in amount, (2) based on services actually rendered, and (3) paid or incurred. Eller v. Commissioner, 77 T.C. 934, 962 (1981).

[*12] In support of their contention petitioners offered evidence in the form of a general ledger listing numerous payments to several individuals under the heading "payroll" and bank statements showing electronic transfers from NXTM's account. At trial J. Yapp briefly testified that when MTV assigned the platform to NXTM the MTV employees associated with the platform's development came to work for NXTM. Petitioners produced no corroborating witnesses or other contemporaneous employment-related documents such as employment contracts, Forms W-2, Wage and Tax Statement, or Forms 1099-MISC, Miscellaneous Income, to substantiate their claim. Petitioners failed to provided any details regarding the number of NXTM's employees, their job descriptions, or the amounts that NXTM was obligated to pay them. Petitioners thus failed to meet their burden to substantiate entitlement to a deduction for wages paid greater than that allowed by respondent.

B.     RFRL Expenditures

Petitioners contend that their expenditures related to developing RFRL's product line qualify as deductible business expenses under section 162. Respondent contends that even though petitioners paid these expenses they are startup expenditures subject to the limitations of section 195 as opposed to section 162 business expenses. Respondent further argues that even if RFRL qualified as

**[*13]** an active trade or business, petitioners failed to substantiate the expenses that they deducted for RFRL.

Section 195(a) provides the general rule that no current deduction shall be allowed for startup or pre-opening expenses. Section 195(c) defines "start-up expenditures" to include any amount:

> (A) paid or incurred in connection with--
>
> > (i) investigating the creation or acquisition of an active trade or business, or
> >
> > (ii) creating an active trade or business, or
> >
> > (iii) any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity becoming an active trade or business, and
>
> (B) which, if paid or incurred in connection with the operation of an existing active trade or business * * * would be allowable as a deduction for the taxable year in which paid or incurred.

Startup expenses, although not deductible during the pre-opening phase, may generally be deducted or capitalized and deducted over time upon a taxpayer's becoming actively engaged in a trade or business pursuant to section 195. Sec. 1.195-1T, Temporary Income Tax Regs., supra; see Woody v. Commissioner, slip op. at 10.

[*14] Whether a taxpayer's activities constitute the carrying on of a trade or business requires an examination of the facts and circumstances of each case. See Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987); see also Woody v. Commissioner, slip op. at 9-10. When determining whether a trade or business exists the Court focuses on three factors: (1) whether the taxpayer undertook the activity intending to earn a profit, (2) whether the taxpayer is regularly and actively involved in the activity, and (3) whether the taxpayer's activity has actually commenced. See Woody v. Commissioner, slip op. at 11.

When, as a threshold matter, did T. Yapp complete RFRL's startup phase and become actively engaged in business? Petitioners both testified at trial about T. Yapp's efforts to research and develop an RFRL-branded product line. Generally, their testimony suggested that RFRL's business was still in development and had not begun operating in 2010. T. Yapp testified about testing and experimenting with different RFRL product recipes; learning about the potential health benefits of using probiotic products; and creating RFRL's product line through trial and error. Numerous email conversations, cost analyses, online educational articles, bank records, credit card statements, and canceled checks in evidence also demonstrate that RFRL remained in the startup phase throughout 2010. Significantly, the first delivery of market-ready RFRL products did not

**[\*15]** arrive in the United States until late December 2010, and shipping-related damage delayed the products' delivery to RFRL even further. Petitioners launched RFRL's products at an official launch party in February 2011.

T. Yapp's description of her activities during 2010 and the corroborating documentation persuade us that the definition of startup expenses in section 195(c) is applicable to those activities. The preponderance of the evidence leads to the conclusion that petitioners' RFRL-related activities did not rise to the level of a trade or business until the company's official launch in February 2011 at the earliest. It was at this point that RFRL actually commenced offering probiotic health food for sale. See, e.g., Koenig v. Commissioner, T.C. Memo. 1998-215, slip op. at 13-14 (citing Kennedy v. Commissioner, T.C. Memo. 1973-15), aff'd, 221 F.3d 1348 (9th Cir. 2000). Since all the expenses at issue in this case were paid or incurred before the February 2011 launch, we conclude that they qualify as startup expenditures. As such the RFRL-related expenses are subject to the provisions of section 195 and cannot currently be deducted under section 162. See Hardy v. Commissioner, 93 T.C. 684. We sustain respondent's determination in the notice to disallow deductions for these expenses.

[*16] II.     Accuracy-Related Penalty

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). As determined in the notice of deficiency petitioners' understatement of income tax for 2010 was substantial, and respondent determined the penalty under section 6662(a) and (b)(2) for that year.

Under section 7491(c) respondent has the burden of production with respect to the accuracy-related penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). To satisfy respondent's burden of production under section 7491(c), respondent must produce evidence showing, inter alia, that respondent's representatives complied with section 6751(b)(1). See Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). The record contains a penalty approval form that shows that respondent's representatives complied with section 6751(b)(1). Responded has met the burden of production in this case. See id. at ___, slip op. at 22. As respondent has done so, it is petitioners' burden to establish that the

**[\*17]** imposition of the penalty is not appropriate.  See Higbee v. Commissioner, 116 T.C. at 447.

Section 6664(c)(1) provides an exception to the section 6662(a) penalty if it is shown that there was reasonable cause for any portion of the underpayment and the taxpayer acted in good faith.  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability.  Id.  Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in view of the taxpayer's experience, knowledge, and education. Id.

According to petitioners, the penalties are not applicable because they relied upon their C.P.A. to report the Federal income tax liabilities shown on their joint returns.  Under certain circumstances a taxpayer's reliance upon professional advice may establish the taxpayer's reasonable cause and good faith with respect to an underpayment of tax.  To establish reasonable cause through reliance on professional advice the taxpayer must prove that (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer

**[\*18]** provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance on a return preparer is not reasonable where "even a cursory review" of the tax return would reveal errors. Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987).

Petitioners have not established that they provided their C.P.A. with complete and accurate information. T. Yapp testified at trial that they provided their C.P.A. with only the general ledgers that their bookkeeper kept to record income and expenses for NXTM, RFRL, and the Yapp household.

Furthermore, J. Yapp admitted at trial that he approved the filing of the returns without fully reviewing them. Had petitioners reviewed the returns, they would have noticed the numerous mistakes that they claim their C.P.A. made, such as selecting the wrong accounting method for reporting NXTM's taxable income in 2009, including personal expenses as part of RFRL's business deductions, and failing to continue to claim on the 2010 return depreciation deductions claimed for 2009. The identified mistakes undermine any assumption that the preparer was a competent professional merely because he was a C.P.A. Petitioners' purported reliance on their C.P.A. does not establish that they acted with reasonable cause

**[\*19]** and in good faith.  Therefore, the Court sustains respondent's determination that petitioners are liable for the section 6662(a) accuracy-related penalty for 2010.

We have considered all of the parties' arguments, and, to the extent not addressed above, we conclude that they are moot, irrelevant, or without merit.  To reflect the foregoing,

Decision will be entered

under Rule 155.