T.C. Memo. 2002-61


UNITED STATES TAX COURT


OLIVER W. AND EDNA D. WILSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3620-96, 3621-96.        Filed March 5, 2002.


Oliver W. Wilson, pro se.

<u>Roger P. Law</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:  In separate notices of deficiency for 1992 and 1993, respondent determined the following deficiencies and accuracy-related penalties for negligence with respect to petitioners' Federal income taxes:

|  | | Penalty |
| Year | Deficiency | Sec. 6662(b)(1) |
| --- | --- | --- |
| 1992 | $19,181 | $3,836 |
| 1993 | 24,707 | 4,941 |

Petitioners filed a petition to redetermine the deficiency and penalty for 1993 and a second petition to redetermine the deficiency and penalty for 1992. We consolidated these cases for purposes of trial, briefing, and opinion pursuant to Rule 141(a)[1] because they present common questions of fact and law. For convenience, these cases hereinafter are referred to as this case.

After concessions,[2] the issues for decision are as follows:

(1) Whether petitioners are entitled under section 162(a) to deductions claimed on Schedules C, Profit or Loss From Business, for 1992 and 1993 with respect to a purported restaurant/nightclub business and, if so, in what amounts;

(2) whether petitioners are entitled under section 167 to deduct depreciation expenses claimed with respect to two

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that 25 percent of the building petitioner Oliver W. Wilson owned at 5401-9 S. Broadway was placed in service and used for rental purposes during 1991, 1992, and 1993.

purported rental real properties for 1992 and 1993 and, if so, in what amounts;

(3) whether petitioners are entitled under section 162 or 212(2) to deduct on Schedule E, Supplemental Income and Loss, expenses with respect to their two purported rental properties for 1992 and 1993 and, if so, in what amounts;

(4) whether petitioners are entitled to deduct under section 172 certain net operating losses they had computed with respect to 1990 and 1991 and carried forward to 1992 and 1993 and, if so, in what amounts;

(5) whether petitioners are liable under section 6662(a) and (b)(1) for accuracy-related penalties for negligence for 1992 and 1993.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and second supplemental stipulation of facts are incorporated herein by this reference.

Petitioners, who filed joint Federal income tax returns for 1992 and 1993, resided in Los Angeles, California, when they filed their petitions in this case.

Background

On or about September 22, 1980, Oliver W. Wilson (petitioner) and his brother, Fred L. Wilson (Fred), purchased

commercial real property located at 5401-9 S. Broadway, Los Angeles, California (the 5401-9 S. Broadway property), for a total purchase price of $130,000, consisting of a $30,000 cash downpayment and a deed of trust to the sellers for the remaining $100,000. In 1985, Fred deeded his interest in the 5401-9 S. Broadway property to petitioner for approximately $65,000. Later that year, petitioner paid off the deed of trust on the property.

The 5401-9 S. Broadway property consists of a two-story building and a large parking area. The building, which was constructed in 1922, has a total floor area of approximately 27,000 square feet, or 13,500 square feet per floor. From the 1920s until 1968, the first floor of the building contained various retail businesses. The second floor contained a nightclub/ballroom facility known as the "5-4 Ballroom". Following World War II, the 5-4 Ballroom became a popular entertainment venue among Black entertainers and patrons in the Los Angeles area and featured primarily Black entertainers and musicians, including a number of prominent blues and jazz artists.

The 5-4 Ballroom closed in 1968, 3 years after the Watts riots. However, the rental activity on the first floor of the building continued, with space being rented to various businesses. When petitioner and Fred purchased the 5401-9 S. Broadway property in 1980, there were four tenants on the first

floor of the building: A women's dress shop, a refrigeration business, a beauty shop, and Fred's garment cutting business.

Petitioner had learned from Fred that the property was for sale. Petitioner knew of the building's history and the 5-4 Ballroom's past popularity. Petitioner purchased the 5401-9 S. Broadway property intending to refurbish the building, equip it with a restaurant, and reopen the 5-4 Ballroom as a full-service restaurant and nightclub.

In 1980, petitioner was a professor at California State University-Domingues Hills in the Los Angeles area, where he taught political science and related subjects. He also had experience working as a general contractor, having owned a construction company that built some apartments and houses and several gas stations. He also once owned a small fast-food restaurant.

Petitioner's Renovation and Use of the 5401-9 S. Broadway Property

After purchasing the 5401-9 S. Broadway property, petitioner initially attempted to secure financing to refurbish the building and reopen its nightclub/ballroom. He soon discovered, however, that this area of South Central Los Angeles had been redlined by institutional lenders and that financing would be difficult to obtain.

Around 1983, the city of Los Angeles passed an earthquake retrofitting ordinance. Pursuant to this ordinance, the city of

Los Angeles determined that many old buildings, including petitioner's building, required retrofitting to bring them up to prescribed earthquake safety standards, and petitioner was issued a notice requiring him to retrofit his building. If petitioner failed to retrofit his building, the city ultimately would close the building and demolish it.

In planning and carrying out the earthquake retrofitting and refurbishing work on the building, petitioner acted as his own general contractor. He hired architects and civil and structural engineers and prepared a plan for the work required. He applied to the city of Los Angeles for plan approval. Beginning in 1987, petitioner also entered into contracts with various engineers and contractors in connection with the building's renovation and improvement.

On or about July 2, 1987, petitioners received a $213,700 Small Business Administration program loan to retrofit and refurbish the building (the SBA loan).

From September 1980 through early July 1987, petitioner had continued to rent space on the first floor of the building to various tenants. Shortly after petitioner received the SBA loan, petitioner's tenants vacated the premises to allow the earthquake retrofitting work on the building to proceed. From about July

1987, when the retrofitting work began, until 1991, no portion of the building's first floor was rented by petitioner to a tenant.[3]

From mid-1987 through 1989, petitioner experienced a number of unforeseen problems in his efforts to refurbish the building and reopen the 5-4 Ballroom. Sometime in 1989, petitioner exhausted the SBA loan funds and was forced to seek additional financing. By the end of 1989, petitioners owed $231,992.67 on the SBA loan and did not have the funds necessary to continue the construction work.

In early 1990, petitioners applied for and received a construction loan from South Coast Thrift & Loan Association (the South Coast Thrift loan). To secure their repayment of the loan, petitioners executed deeds of trust in favor of South Coast Thrift on the 5401-9 S. Broadway property and on their home. Based on representations made to petitioner by South Coast Thrift, petitioner believed that South Coast Thrift would lend him up to $850,000, an amount petitioner estimated would be sufficient to (1) pay off the SBA loan, (2) complete the refurbishing of the building, and (3) cover his initial operating expenses in reopening the 5-4 Ballroom.

---

[3]From September 1980 through at least the end of 1993, the second floor of the building (which had contained the former 5-4 Ballroom) was not used by petitioner in any business or rental activity.

Shortly after petitioners settled on the South Coast Thrift loan, construction on the building resumed.  However, work proceeded very slowly as petitioner encountered further problems. Among other things, multiple thefts of building materials and electrical fixtures forced petitioner to install a security alarm system for the building.  The city of Los Angeles also required petitioner to perform unanticipated additional work and repairs to the building, including replacing the sewer system from the building to the street curb and installing an elevator from the first to the second floor, a sprinkler system, and a unified electrical system for the building.

Sometime in 1990, after construction on the building resumed, representatives of South Coast Thrift informed petitioner that South Coast Thrift would not provide enough money under the South Coast Thrift loan to complete all the work that had been contemplated in his loan application.[4]

By the end of 1990, petitioner was forced to scale back his plans for renovating the building and reopening the 5-4 Ballroom. At this point, petitioner decided it would be more feasible to

---

[4]In 1991, litigation between South Coast Thrift and petitioners ensued.  On Mar. 18, 1992, petitioners commenced a proceeding under ch. 11 of the Bankruptcy Code with the U.S. Bankruptcy Court for the Central District of California. Ultimately, in or about September 1994, petitioners and South Coast Thrift entered into a settlement, pursuant to which they agreed to reconfigure petitioners' former South Coast Thrift loan as a new $450,000 loan secured by the 5401-9 S. Broadway property.

convert and use a 6,000-square-foot space on the building's first floor for a "Bluesroom" instead of proceeding with his original plans for a restaurant and nightclub on the second floor.

During 1991, 1992, and 1993, petitioner rented or tried to rent approximately half of the building's first floor to various third parties. In January 1991, he rented space on that floor to an artist. However, the artist occupied the space for less than 3 months and failed to pay petitioner the rent required under their lease agreement. During 1992 and 1993, petitioner permitted an attorney to maintain her law office on part of the first floor. Pursuant to their rental arrangement, the attorney agreed to perform legal services for petitioner in lieu of paying petitioner cash rent. From July through December 1992, this attorney also rented additional space on the first floor from petitioner for a nursery/flower shop business, but this planned business venture never got off the ground. In November 1992, petitioner had a commercial property realtor attempt to rent space on the first floor to prospective tenants, but the realtor's efforts proved unsuccessful.

During 1991, 1992, and 1993, petitioner also sought to raise funds to complete the building's renovation. For example, beginning in 1991, petitioner attempted to interest others in renovating the building and reopening the 5-4 Ballroom. Among other things, petitioner filed a fictitious business name for the

"5-4 Ballroom/Supper Club" in October 1991.  He then attempted to raise capital to reopen the 5-4 Ballroom by providing an "investment opportunity" for individuals in the "5-4 Ballroom/Supper Club".  During 1992, petitioner worked with a mortgage banking company in an effort to raise about $1.5 million from the local Black business community.  However, the effort was unsuccessful, due to the large claim South Coast Thrift was then asserting against petitioners and the 5401-9 S. Broadway property.

During 1991 and 1992, petitioner also offered annual memberships in the "5-4 Ballroom/Supper Club Inner Circle".  A membership would entitle a person to discounts when attending performances in the planned ballroom/supper club and also to a birthday celebration there.  Although a small amount of membership fees was collected during 1992, no income from membership fees was reported on petitioners' 1992 income tax return.[5]

Beginning in 1992, petitioner arranged for various charitable events to be held on the grounds of the 5401-9 S. Broadway property.  He also arranged for an event to be held in

_____

[5]Because the planned 5-4 Ballroom/Supper Club did not open, the membership fees petitioner collected were probably refunded or refundable, but the record does not disclose what happened to these fees.  We note, however, that respondent did not determine that the membership fees were income to petitioners in either 1992 or 1993.

the building's Bluesroom in late 1992.  These and other similar events held during 1992 and 1993 were primarily fundraisers for local philanthropic organizations.  Petitioner believed that these events would help to publicize and stimulate community interest in his efforts to renovate the building and reopen the 5-4 Ballroom.  He also hoped the resulting publicity and community interest might encourage others to invest in the project.

Petitioner and his agents contracted with entertainers and musicians to perform at some of the events.  Petitioner also obtained temporary liquor permits in the names of the philanthropic organizations holding the events to sell alcoholic beverages on the grounds and in the Bluesroom during the events.  During 1992 and 1993, there was no restaurant facility in the building.  Any food provided at the events was obtained from outside caterers, brought to the location, and heated.

All gross receipts generated from the charitable events held during 1992 and 1993 were used either to compensate the entertainers and musicians or to pay for refreshments and other overhead expenses.  Any balance remaining was paid to the philanthropic organizations holding the events.  These gross receipts consisted of donations from people attending the events and payments for the refreshments sold during the events.  Although petitioner and his agents were involved in collecting

the gross receipts the events generated, none of the gross receipts were reported on petitioner's 1992 and 1993 income tax returns. Petitioner did not charge any rent for the use of the grounds or the Bluesroom during these events or report any net profit or income from the charitable events.

On or about October 21, 1994, shortly after his settlement with South Coast Thrift, petitioner hired a consultant to help him obtain a liquor license for the Bluesroom/5-4 Ballroom. On October 28, 1994, petitioner held a public ceremony at the building celebrating his "reopening of the 5-4 Ballroom/Supper Club" and began operating the Bluesroom as a commercial entertainment facility. Following the ceremony, petitioner offered performances in the Bluesroom to the public for which he charged customers an admission fee or cover charge of $10 per person. Thereafter, on a number of days from 1994 through 1995, petitioner charged customers admission fees to attend various events and performances held in the Bluesroom. None of the performances were held in the original 5-4 Ballroom space on the second floor because the second floor still required additional substantial work before it could be used in a commercial activity.

Petitioners' 1992 and 1993 Income Tax Returns

Since 1968, petitioners' income tax returns, including their returns for the years in issue, were prepared by William D.

Collins.  Mr. Collins has been a certified public accountant since 1959.

Schedule C Expenses

On Schedules C of petitioners' 1992 and 1993 returns, petitioners reported no income and deducted the following expenses and net loss from the restaurant business purportedly conducted by petitioner at the 5401-9 S. Broadway property:

|  | 1992 | 1993 |
|---|---|---|
| Expenses: | | |
| Insurance | $9,200 | $11,200 |
| Legal and pro- | | |
| fessional services | 1,400 | 5,000 |
| Repairs and maintenance | 2,700 | 4,964 |
| Taxes and licenses | 4,837 | 4,191 |
| Utilities | -- | 271 |
| Other-- | | |
| Alarm system | -- | 300 |
| Appraisals | -- | 3,000 |
| Locksmith | -- | 53 |
| Permits | -- | 275 |
| | 18,137 | 29,254 |
| Net loss | (18,137) | (29,254) |

On Schedule C to their 1992 return, petitioners stated the restaurant business had been in operation during all 12 months of that year.

Schedule E Expenses

On Schedule E to their 1992 return, petitioners reported no rental income and deducted the following expenses and net losses from the 5401-9 S. Broadway property and another property located at 5415 S. Broadway (the 5415 S. Broadway property):

|  | 5401-9 S.<br>Broadway Prop. | 5415 S.<br>Broadway Prop. |
|---|---|---|
| Mortgage int. | -- | $7,015 |
| Gardening | $475 | -- |
| Depreciation | 19,652 | 1,844 |
|  | 20,127 | 8,859 |
| Net loss | (20,127) | (8,859) |

Applying the passive activity loss limitation of section 469, petitioners for 1992 deducted $25,000 in total Schedule E losses from the 5401-9 S. Broadway property and the 5415 S. Broadway property.

On Schedule E to their 1993 return, petitioners reported the following rental income, expenses, and net losses from the 5401-9 S. Broadway property and the 5415 S. Broadway property:

|  | 5401-9 S.<br>Broadway Prop. | 5415 S.<br>Broadway Prop. |
|---|---|---|
| Rental Income | [1]$18,000 | -- |
| Expenses: |  |  |
|   Mortgage int. | -- | $1,000 |
|   Legal and pro-<br>   fessional fees | [1]18,000 | -- |
|   Taxes | -- | 1,159 |
|   Depreciation | 19,652 | 1,844 |
|  | 37,652 | 4,003 |
| Net loss | (19,652) | (4,003) |

[1]The rental income of $18,000 and corresponding $18,000 of legal and professional fees expense that petitioners reported for 1993 from the 5401-9 S. Broadway property were attributable to the previously described arrangement between petitioner and an attorney whereby the attorney received office space on the building's first floor in exchange for her providing legal services to petitioner.

Applying the passive activity loss limitation of section 469, petitioners for 1993 deducted total Schedule E losses of $25,000, consisting of (1) their total net losses of $23,655 for that year from the 5401-9 S. Broadway and the 5415 S. Broadway properties and (2) $1,345 of unallowed prior year passive losses.

The 1992 and 1993 depreciation expenses petitioners claimed were computed as follows:

| Rental Prop. | Date acquired | Cost/ basis | Deprec. basis | Method | Life (yrs.) | Annual deprec. expense |
|---|---|---|---|---|---|---|
| 5401-9 S. Broadway-- | | | | | | |
| Building | 10/1/80 | $87,000 | $87,000 | S/L | 20 | $4,350 |
| Land | 10/1/80 | 75,000 | 75,000 | -- | -- | - |
| Improvement | 6/1/87 | 70,250 | 70,250 | S/L (MM) | 31.5 | 2,230 |
| Improvement | 6/1/90 | 411,723 | 411,723 | S/L (MM) | 31.5 | 13,072 |
| 5415 S. Broadway | 3/15/86 | 34,800 | 34,800 | S/L | 19 | 1,844 |

In computing petitioners' depreciation expenses for 1992 and 1993 with respect to the 5401-9 S. Broadway property building and improvements, Mr. Collins concluded that petitioners had used the entire building in a trade or business or had held the entire building for the production of income.

Net Operating Loss Deductions

On their 1992 and 1993 returns, petitioners deducted net operating losses (NOL) in the respective amounts of $92,611 and $57,518 that were carried forward from 1990 and 1991.

The 1990 NOL carryover arose from a net loss of $132,121 petitioners had claimed on Schedule C to their 1990 return. On their 1990 Schedule C, petitioners reported no income and

deducted the following expenses and net loss from their purported "Louisiana Creole/Cajun" restaurant business at the 5401-9 S. Broadway property:

```
        Expenses:
          Interest              $116,121
          Insurance              10,000
          Utilities               3,000
          Lease expense           3,000
                                 132,121

        Net loss               (132,121)
```

On their 1990 return, petitioners failed to elect to relinquish, under section 172(b)(3)(C), the 3-year carryback period otherwise required by section 172(b)(1)(A) with respect to their claimed 1990 NOL. If petitioners had carried back the 1990 NOL to 1987, 1988, and 1989, as required, their claimed 1990 NOL would have been reduced by $44,820.

The 1991 NOL carryover arose from a net loss of $73,235 petitioners claimed on the Schedule C to their 1991 return. On their 1991 Schedule C, petitioners reported no income and deducted the following expenses and net loss from their restaurant business at the 5401-9 S. Broadway property:

```
        Expenses:
          Interest                 $43,276
          Insurance                  3,439
          Utilities                  2,077
          Repairs and maintenance    2,211
          Supplies                   1,263
          Taxes and licenses         6,492
          Other                     14,477
                                    73,235

        Net loss                   (73,235)
```

The interest claimed on petitioners' Schedules E for 1990 and 1991 was attributable to petitioners' South Coast Thrift loan.

Notices of Deficiency

On November 27, 1995, respondent sent petitioners a notice of deficiency for 1993. On December 8, 1995, respondent sent petitioners a notice of deficiency for 1992.

In the notices of deficiency, respondent disallowed all the Schedule C expenses petitioners deducted for 1992 and 1993. Respondent determined that the expenses (1) had not been substantiated, (2) had not been established to be ordinary and necessary business expenses, or (3) were startup expenses, because petitioner's restaurant had not yet opened for business.

Respondent also disallowed the entire Schedule E loss petitioners deducted for 1992. Respondent determined that the Schedule E loss had not been either substantiated or established to be deductible. As to the 1993 Schedule E loss petitioners deducted, respondent disallowed: (1) All the expenses that petitioners claimed from the 5401-9 S. Broadway property, except for 6 percent of the $19,652 of depreciation and 6 percent of the $18,000 of legal expense; (2) all the expenses that petitioners claimed from the 5415 S. Broadway property; and (3) all $1,345 of the unallowed prior year passive losses that petitioners claimed. Among other things, respondent determined that only 6 percent of

the 5401-9 S. Broadway property building was used for rental purposes during 1993.[6]  He also determined that only 6 percent of the legal expense was allocable to the portion of the building used for rental purposes and that the remaining 94 percent had to be added to petitioners' basis for the portion of the building not used for rental purposes.

Respondent also disallowed all the 1992 and 1993 NOL deductions that petitioners claimed.  Among other things, respondent determined that it had not been established either that any 1990 and 1991 NOLs were incurred or that the 1990 and 1991 NOLs were available to be carried forward to 1992 and 1993.

Finally, respondent determined that petitioners were liable for accuracy-related penalties under section 6662 for negligence with respect to the entire underpayment for 1992 and 1993.

Petitioners' Various Bankruptcy Proceedings

As previously indicated, on March 18, 1992, petitioners commenced a proceeding under chapter 11 of the Bankruptcy Code with the U.S. Bankruptcy Court for the Central District of California (the Bankruptcy Court).  On October 5, 1994, the

---

[6]Respondent now concedes that 25 percent of the building was used for rental purposes by petitioner during 1992 and 1993 and further agrees that petitioners are entitled to deduct, under sec. 167, up to 25 percent of the $19,652 of annual depreciation expense claimed for each year with respect to the building and improvements.

Bankruptcy Court entered its Order Confirming the Debtors' Joint Non-Adverse Fifth Amended Plan of Reorganization.[7]

Following the issuance of the notice of deficiency for 1993 on November 27, 1995, and the issuance of the notice of deficiency for 1992 on December 8, 1995, petitioners timely filed their respective petitions with this Court, commencing this case.

On September 9, 1996, the Bankruptcy Court entered an order granting petitioners' motion to convert their chapter 11 proceeding to a chapter 7 proceeding. As a result, on May 12, 1997, after being notified of petitioners' pending chapter 7 proceeding before the Bankruptcy Court, we stayed the proceedings in this case.

On September 29, 1997, the Bankruptcy Court entered an Order of Discharge releasing petitioners from all dischargeable debts. As a result, after being notified by the parties of the discharge order entered in petitioners' bankruptcy proceeding, we ordered this case restored to the general docket on March 26, 1998.

On April 8, 1998, we entered an order setting this case for trial during this Court's trial session beginning on September 8, 1998, in Los Angeles, California.

---

[7]This Oct. 5, 1994, order of the Bankruptcy Court had the effect of lifting the automatic stay in petitioners' ch. 11 bankruptcy proceeding. Moody v. Commissioner, 95 T.C. 655, 658-664 (1990).

On or about June 30, 1998, petitioners commenced a proceeding under chapter 13 of the Bankruptcy Code with the Bankruptcy Court.  As a result, on July 20, 1998, we stayed the proceedings in this case.

After being notified that the Bankruptcy Court had dismissed petitioners' chapter 13 proceeding, we lifted the stay in the proceedings in this case on August 17, 1998.  We further directed the parties to submit a joint status report concerning whether this case would be ready for trial during this Court's trial session beginning on September 8, 1998, in Los Angeles, California.

On September 16, 1998, we held the trial in this case.

On October 20, 1998, petitioners commenced a proceeding under chapter 7 of the Bankruptcy Code with the Bankruptcy Court. As a result, after being notified of petitioners' commencement of this bankruptcy proceeding, we stayed the proceedings in this case on November 17, 1998.

In its Order of Discharge dated February 8, 1999, the Bankruptcy Court granted petitioners a discharge in the chapter 7 bankruptcy proceeding they had commenced on October 20, 1998. The Explanation Of Bankruptcy Discharge in a Chapter 7 Case included with this order, stated, in pertinent part:

> Debts That are Discharged
>
> The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is

discharged.  Most, but not all, types of debts are discharged if the debt existed on the date the bankruptcy case was filed whether the debt was included in the schedules or omitted from them.  * * *

Debts That are Not Discharged

Some of the common debts which are not discharged in a chapter 7 bankruptcy case are.

a. Debts for most taxes;[8]

* * * * * * *

This information is only a general summary of the bankruptcy discharge.  There are exceptions to these general rules.  Any party may request reopening of a bankruptcy case to determine whether a particular debt was included within the scope of the discharge.
* * *  Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.

On March 2, 1999, petitioner filed a motion to dismiss in this case.

By order dated March 27, 2000, we (1) lifted the stay of the proceedings in this case, effective as of the February 8, 1999, date of the Bankruptcy Court's order of discharge and (2) denied petitioner's motion to dismiss.  The March 27, 2000, order denying petitioners' motion to dismiss cited our decision in Freytag v. Commissioner, 110 T.C. 35, 40-41 (1998), and stated that, when a Bankruptcy Court exercises its jurisdiction to determine a taxpayer's income tax liabilities, its decision does

---

[8]See Sheinfeld et al., Collier On Bankruptcy Taxation, pars. TX4.02[1][iii], TX5.03[4] (1997).

not deprive this Court of subject matter jurisdiction in a proceeding filed by the taxpayer in this Court.

OPINION

I.   Preliminary Matters

Petitioners filed an opening brief and a supplemental brief in this case.  Petitioners' arguments in both briefs focused almost exclusively on the effect of petitioners' various bankruptcy proceedings on this Court's jurisdiction and on this Court's ability to dispose of the substantive issues raised at trial and in respondent's trial briefs.  Petitioners also filed a posttrial motion to dismiss, raising the same jurisdictional issue discussed in their posttrial briefs.

As best we understand them, the procedural issues raised in petitioners' posttrial briefs and/or in the motion to dismiss were as follows:

(1) Whether this Court has the requisite jurisdiction to adjudicate the issues involved in this case;

(2) whether the amounts at issue in this case were discharged in petitioners' bankruptcy proceedings; and

(3) whether the doctrine of res judicata applies to prevent the adjudication of the issues involved in this case.

Upon consideration of petitioners' motion to dismiss and respondent's objections to petitioners' motion, we concluded that petitioners' bankruptcy proceedings did not deprive us of

jurisdiction over this case, <u>Freytag v. Commissioner</u>, <u>supra</u> at 41, and we denied petitioners' motion.  Although petitioners in their posttrial briefs again attempt to challenge this Court's jurisdiction in this case, we reject petitioners' jurisdictional argument.

We also reject petitioners' allegations that the tax liabilities at issue in this case were fully litigated in their bankruptcy proceeding and that the doctrine of res judicata operates to preclude additional litigation in this Court.  The record is devoid of any evidence demonstrating that the subject tax liabilities were ever litigated in any of petitioners' bankruptcy proceedings.  In fact, the order of discharge relied upon by petitioners expressly states that the debts for most taxes are not discharged in a chapter 7 bankruptcy case and that any party to that case may request that it be reopened to determine whether a particular debt has been discharged.  See <u>Neilson v. Commissioner</u>, 94 T.C. 1, 9 (1990) (Tax Court lacks jurisdiction to decide whether income tax deficiencies were discharged in bankruptcy).  Moreover, petitioners have made no effort to explain how the elements of res judicata are satisfied by the record in this case.  Consequently, we reject petitioners' bankruptcy-related arguments, and we proceed to the substantive issues presented in this case.

II.  The Trade or Business Requirement of Section 162

Section 162(a) authorizes a taxpayer to deduct ordinary and necessary expenses incurred in carrying on a trade or business. Petitioners summarily allege that they operated a Schedule C trade or business, i.e., a restaurant/nightclub facility, and that they properly deducted expenses incurred in operating the trade or business on Schedules C to their 1992 and 1993 returns. Petitioners also summarily allege that they properly deducted NOLs carried forward from 1990 and 1991 arising from expenses they incurred and paid with respect to the same business. See infra part VI.  Respondent contends that petitioners had not yet started their restaurant/nightclub business in 1990, 1991, 1992, or 1993 and that the expenses in question were not incurred in carrying on an existing trade or business.

Whether a taxpayer is engaged in a trade or business requires an examination of the relevant facts and circumstances. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987).  In conducting the examination, we look to see whether the taxpayer has undertaken the activity with the intent to make a profit, whether the taxpayer is regularly and actively involved in the activity, and whether the taxpayer's business activity has actually commenced.  McManus v. Commissioner, T.C. Memo. 1987-457, affd. without published opinion 865 F.2d 255 (4th Cir. 1988).

Respondent concedes that petitioners' attempt to renovate and retrofit the 5401-9 S. Broadway property was motivated by their intention to make a profit through the operation of the 5-4 Ballroom and/or the Bluesroom. Respondent contends, however, that petitioners' Schedule C business activity had not actually commenced during the period from 1990 through 1993. We examine the relevant time periods below.

A.   <u>1990 and 1991</u>

The expenses petitioners allegedly incurred during 1990 and 1991 in connection with their restaurant/nightclub activity are not deductible under section 162(a) "unless the taxpayer is engaged in an ongoing business at the time the expense is incurred." <u>Kantor v. Commissioner</u>, 998 F.2d 1514, 1518 (9th Cir. 1993), affg. and revg. on other issues T.C. Memo. 1990-380; see also <u>Jackson v. Commissioner</u>, 86 T.C. 492, 514 (1986), affd. 864 F.2d 1521 (10th Cir. 1989), in which we stated:

> Section 162 does not allow deductions for otherwise deductible expenses until such time as the trade or business begins to function as a going concern even though the taxpayer may have made a firm decision to enter into business and has expended considerable sums of money in preparation of commencing business.

The record clearly establishes that petitioners had not yet opened the restaurant/nightclub facility during 1990 and 1991. Petitioners were still refurbishing and retrofitting the building in 1990 and 1991 and otherwise preparing to start their business.

No food or entertainment was offered to the public either on the premises or inside the building during those years.

B.    1992 and 1993

Because of the many difficulties petitioners encountered in financing and completing the renovation of the 5401-9 S. Broadway property, petitioners were forced to alter their original plans. They put their plans for the 5-4 Ballroom on hold and decided to open a "Bluesroom" on part of the building's first floor.

Beginning in August 1992, petitioners permitted a few performances and fundraising events to be held on the 5401-9 S. Broadway property.  As of that date, however, and continuing through 1993, petitioners did not yet have any functioning restaurant or entertainment facility that petitioners operated for profit.  Any events held on the 5401-9 S. Broadway property during 1992 and 1993 were organized by volunteers who collected admission fees and used the admission fees to offset the cost of the event and to pay the performer.  Petitioners did not retain any of the receipts from the events and charged no rent for the use of the property.  Petitioners viewed these events as opportunities to promote the Bluesroom and to solicit investors who might be willing to invest funds to complete the renovation of the property.

During 1992 and 1993, petitioners did not maintain any general ledger, cash receipts and disbursements journals, or

business checking account for their alleged restaurant/nightclub activity. Petitioners did not report any of the receipts from admissions, the sale of food and beverages, or paid memberships as income on their Schedules C for 1992 and 1993. Indeed, in 1991, litigation with South Coast Thrift had ensued, and petitioners commenced a proceeding under chapter 11 of the Bankruptcy Code with the Bankruptcy Court on March 18, 1992. Petitioner did not begin operating the Bluesroom as a commercial entertainment facility until October 28, 1994, shortly after reaching a settlement with South Coast Thrift.

In Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68 (1965), the Court of Appeals for the Fourth Circuit explained that a trade or business within the meaning of section 162(a) is one that "has begun to function as a going concern and performed those activities for which it was organized." In Walsh v. Commissioner, T.C. Memo. 1988-242, affd. without published opinion 884 F.2d 1393 (6th Cir. 1989), we quoted the above-cited language in support of our conclusion that the taxpayer's restaurant "could not function as a going concern until its opening to the public." Since the restaurant did not open to the public until a later year, we held that the taxpayer in Walsh was not carrying on a trade or business in the year before its public opening.

Although petitioners permitted the 5401-9 S. Broadway property to be used for certain events during 1992 and 1993, we nevertheless conclude, based on our review of all the relevant facts and circumstances, that petitioners did not actually operate a restaurant/nightclub facility for profit during those years.[9]  Consequently, we hold that the Schedule C deductions at issue in this case, including those that gave rise to the contested NOLs, were not incurred by petitioners in carrying on an existing Schedule C trade or business and, therefore, are not deductible under section 162(a).[10]

III. Capitalization of Production Costs Under Section 263A

Respondent contends that, even if we concluded that petitioners operated a restaurant and nightclub during 1992 and 1993, section 263A required petitioners to capitalize those expenses they deducted on their Schedules C and E for 1990 through 1993 that qualify as production costs under section 263A. Petitioners contend, however, that respondent did not determine

---

[9]In addition, expenses relating to the startup of a business that are incurred before that new business is functioning are not deductible under either sec. 162 or 212. Sec. 195; Hardy v. Commissioner, 93 T.C. 684, 687-693 (1989).

[10]On brief, respondent concedes that, if and to the extent petitioners' claimed 1992 and 1993 Schedule C expenses are substantiated, 25 percent of such "Schedule C expenses" are allocable to the portion of the 5401-9 S. Broadway building used by petitioner for rental purposes and may be deducted as Schedule E expenses by petitioners under sec. 212, subject to the passive loss limitation of sec. 469.

the expenses in question must be capitalized under section 263A in the notices of deficiency and that we should reject respondent's belated attempt to raise section 263A under these circumstances. Petitioners do not explicitly contend that respondent's argument is a new matter on which respondent bears the burden of proof. See, e.g., Abatti v. Commissioner, 644 F.2d 1385 (9th Cir. 1981), revg. T.C. Memo. 1978-392; Shea v. Commissioner, 112 T.C. 183 (1999). Rather, petitioners seem to focus on whether respondent's delay in relying upon section 263A is unfair and prejudicial to petitioners. Nevertheless, because petitioners represented themselves in these proceedings without benefit of counsel and because we conclude petitioners implicitly alleged that respondent's section 263A argument was a new matter, we shall address both petitioners' explicit and implicit arguments, just as respondent did in his posttrial briefs.

A. Respondent's Delay in Relying Upon Section 263A

The notices of deficiency for 1992 and 1993 employed broad language in disallowing petitioners' claimed Schedules C and E expenses and NOL deductions and do not specifically mention section 263A. Petitioners, however, cannot complain that they were unfairly surprised and prejudiced by respondent's assertion of, and reliance upon, section 263A. Petitioners' accountant testified that respondent's counsel had raised the application of section 263A in this case at least 1 year before trial during a

meeting with petitioner and the accountant.  Respondent also discussed section 263A in the trial memorandum he submitted before trial.  Moreover, petitioners were not prejudiced by respondent's section 263A argument.  Accordingly, we shall not bar respondent from relying upon section 263A.  <u>Stewart v. Commissioner</u>, 714 F.2d 977, 985-987 (9th Cir. 1983), affg. T.C. Memo. 1982-209; see also <u>Achiro v. Commissioner</u>, 77 T.C. 881, 891 (1981).

B.  <u>New Matter and Burden of Proof</u>

Section 7522[11] requires the Commissioner to issue a notice of deficiency that contains a description of the basis for the Commissioner's determination.  In this case, respondent issued two notices of deficiency.

The first notice of deficiency, issued with respect to 1993, described respondent's basis for disallowing petitioners' Schedule C expenses as follows:

> It is determined that schedule C expenses are $0.00 rather than $29,254.00 for the taxable year 1993. Since your restaurant business was not in operation in the taxable year, all otherwise allowable expenses are start up expenses which must be amortized over not less than 60 months starting in the month that the restaurant is open for business.  Further, it has not been established that any amount represents an ordinary and necessary business expense or was expended for the purpose designated.

---

[11]Sec. 7522 applies to notices of deficiency issued after Jan. 1, 1990.

The notice also described respondent's basis for disallowing the NOL carryforward as follows:

> It is determined that the net operating loss carryforward from the taxable year 1992 is $0 rather than $57,518 for the taxable year 1993. It has not been established that any deductible net loss was incurred or was available for carryforward to the taxable year 1993.

> The second notice of deficiency, issued with respect to 1992, described respondent's basis for disallowing petitioners' Schedule C expenses as follows:

> Since you did not establish that the business expense shown on your tax return was paid or incurred during the taxable year and that the expense was ordinary and necessary to your business, we have disallowed the amount shown.

The notice also described respondent's basis for disallowing petitioners' NOL carryforward--"Since you did not establish that the amount shown [$92,611] was (a) a loss, and (b) sustained by you, it is not deductible."

Neither notice of deficiency specifically mentions section 263A. Petitioners implicitly argue that respondent's belated attempt to rely on section 263A amounts, in effect, to the raising of a new matter on which respondent bears the burden of proof. See Rule 142(a) ("The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, * * * it shall be upon the respondent.").

In <u>Wayne Bolt & Nut Co. v. Commissioner</u>, 93 T.C. 500, 507 (1989), we distinguished a new theory offered in support of a proposed deficiency from a new matter requiring a shift in the burden of proof as follows:

> A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. <u>Colonnade Condominium, Inc. v. Commissioner</u>, 91 T.C. 793, 795 n. 3 (1988); <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890-891 (1981). A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. <u>Achiro v. Commissioner</u>, <u>supra</u> at 890; <u>Estate of Jayne v. Commissioner</u>, 61 T.C. 744, 748-749 (1974); <u>McSpadden v. Commissioner</u>, 50 T.C. 478, 492-493 (1968).

See also <u>Shea v. Commissioner</u>, <u>supra</u> at 191. Citing this language, respondent contends that his section 263A argument is covered by the notices of deficiency and is merely a new theory, not a new matter.[12] Respondent also contends that (1) even if his section 263A argument raises a new matter, the argument does not require the presentation of evidence different from that required for the issues raised in the notices, but that (2) even if his section 263A argument requires the presentation of

---

[12]In each of the notices of deficiency, respondent asserted that petitioners had failed to establish that they had incurred or sustained the NOL in question and disallowed the NOL carryforward in its entirety. Respondent claims that "This position is consistent with the argument that petitioners' 1990 and 1991 expenses, being subject to capitalization under section 263A, do not produce a deductible loss that may be carried forward. The section 263A argument merely clarifies the reason the net operating loss had not been established."

different evidence, the necessary evidence is a part of the record in this case, and he has met his burden of proof regarding the section 263A issue.

Because we believe that the record is sufficient to decide the section 263A issue regardless of which party bears the burden of proof and that petitioners are not subjected to unfair surprise or prejudice by the introduction of that issue, we proceed to consider respondent's section 263A argument on the merits.

C. <u>Application of Section 263A</u>

Section 263A was enacted as part of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec. 803(a), 100 Stat. 2350, and is generally effective for costs incurred after December 31, 1986, in taxable years ending after December 31, 1986. TRA 1986 sec. 803(d)(1), 100 Stat. 2356. In enacting section 263A, Congress intended that a single, comprehensive set of rules generally should govern the capitalization of costs, including interest expenses, of producing, acquiring, and holding property in order to more accurately reflect income and make the tax system more neutral. <u>Suzy's Zoo v. Commissioner</u>, 273 F.3d 875, 879 (9th Cir. 2001), affg. 114 T.C. 1 (2000); S. Rept. 99-313 at 140 (1986), 1986-3 C.B. (Vol. 3) 1, 140. The term "produce" has been construed broadly in order to give effect to legislative

intent.[13]  E.g., <u>Suzy's Zoo v. Commissioner</u>, <u>supra</u> at 879-880

(taxpayer was "producer" of greeting cards manufactured by third

party contractors); <u>Von-Lusk v. Commissioner</u>, 104 T.C. 207, 214-

216 (1995) (taxpayer's costs of meetings with governmental

officials, obtaining building permits, and drafting architectural

plans were development costs amounting to "production").  Whether

an expenditure is deductible or must be capitalized is a question

of fact.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 86 (1992).

Section 263A[14] provides that a taxpayer's direct and

indirect costs (including taxes) of producing real property for

use in a trade or business or activity conducted for profit must

be capitalized.  Sec. 263A(a)(1)(B) and (2), (b)(2) and (c)(1);

sec. 1.263A-1T(a)(6)(i) and (b)(1) and (2)(i), (ii), and (iii),

Temporary Income Tax Regs., 52 Fed. Reg. 10061, 10062 (Mar. 30,

---

[13]In general, sec. 263A(g)(1) defines the term "produce" to include "construct, build, install, manufacture, develop, or improve."

[14]Temporary regulations under sec. 263A were issued in 1987. Final regulations under sec. 263A were issued in 1993 and 1994. These final regulations generally were made effective for costs incurred in taxable years beginning after Dec. 31, 1993, and interest incurred in taxable years beginning after Dec. 31, 1994. Secs. 1.263A-1(a)(2)(i), 1.263A-15(a)(1), Income Tax Regs.  For costs or interest incurred in taxable years to which the final regulations are not applicable, taxpayers must take reasonable positions on their returns in applying section 263A.  A "reasonable position" is a position consistent with the temporary regulations, revenue rulings, revenue procedures, notices, and announcements concerning sec. 263A applicable in taxable years beginning before the effective date of the final regulations. Secs. 1.263A-1(a)(2)(ii), 1.263A-15(a)(2), Income Tax Regs.

1987); sec. 1.263A-1T(b)(2)(iii)(I), Temporary Income Tax Regs., 52 Fed. Reg. 29378 (Aug. 7, 1987). The production of real property includes the rehabilitation or improvement of an existing building. Sec. 263A(g)(1); sec. 1.263A-1T(a)(5)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 10061 (Mar. 30, 1987); S. Rept. 99-313, supra at 143, 1986-3 C.B. (Vol. 3) at 143; Notice 88-99, 1988-2 C.B. 422.

(1) Interest Expense

Interest paid or incurred during the production period of real property must be capitalized under the special rules of section 263A(f). Sec. 263A(f)(1)(A) and (B)(i), (4)(A)(i). The interest to be capitalized includes (1) interest on any indebtedness directly attributable to production expenditures with respect to the real property, and (2) interest on any other indebtedness to the extent that the taxpayer's interest costs could have been reduced if production expenditures had not been incurred. Sec. 263A(f)(2); sec. 1.263A-1T(b)(2)(iv)(A) and (B), Temporary Income Tax Regs., 52 Fed. Reg. 10063 (Mar. 30, 1987). The production period covers the period (1) beginning on the date on which production of the real property begins and (2) ending on the date on which the real property is ready to be placed in service. Sec. 263A(f)(4)(B); sec. 1.263A-1T(b)(2)(iv)(A), Temporary Income Tax Regs.

Petitioners deducted interest on the South Coast Thrift loan on their Schedules C for 1990 and 1991 in the amounts of $116,121 and $43,276, respectively.  Petitioners appear to contend that the South Coast Thrift loan was a general business loan obtained to start a new business and was not a construction loan governed by the interest capitalization rules of section 263A(f).  The record in this case suggests otherwise.  Regardless of which party bears the burden of proof with respect to section 263A, we have found as a fact that the South Coast Thrift loan was a construction loan taken out by petitioners to finance the retrofitting and renovation of their 5401-9 S. Broadway property and that the interest deducted by petitioners for 1990 and 1991 was attributable to that loan.[15]  Under section 263A(f), because the interest attributable to the South Coast Thrift loan was paid to prepare the 5401-9 S. Broadway property to be placed in service in a trade or business or in an activity for profit, except to the extent allowed by respondent's concession,[16] the interest must be capitalized.  Sec. 263A(f)(1).

(2)  Other Schedule C Expenses

On Schedule C of their 1990 tax return, petitioners deducted

---

[15]Petitioners did not deduct any interest attributable to the South Coast Thrift loan on their Schedules C or E for 1992 and 1993.

[16]See supra note 2.  Respondent also conceded that 6 percent of the building was available for rent and placed in service as rental property during 1989 and 1990.

insurance, utilities, and lease expenses in connection with the 5-4 Ballroom/Supper Club.  Although respondent in his posttrial brief points out that petitioners offered no explanation of these expenses, respondent also states that "common sense dictates the conclusion that petitioner had to maintain utilities, provide liability and fire insurance and rent equipment as a consequence of [petitioner's] rehabilitation activities."  Respondent also acknowledged that "property taxes relate to the ownership of the building", but asserts that petitioners failed to prove what portion of the tax and licenses expense represented property taxes.  Respondent nevertheless does not argue that petitioners' Schedule C expenses must be disallowed for lack of substantiation; rather, respondent argues only that "the expenses for insurance, utilities, lease expense and taxes and licenses, to the extent not allocable to rental activity,[17] will have to be capitalized" as indirect costs of production under section 263A.

Respondent takes a similar position with respect to the expenses petitioners claimed on their 1991 Schedule C, arguing only that the expenses are indirect costs of production under

---

[17]To the extent the expenses are allocable to petitioners' rental activity, respondent acknowledges that the expenses may be deductible under sec. 212(2).  Thomason v. Commissioner, T.C. Memo. 1997-480.  However, respondent notes that, for 1990 and 1991, petitioners already deducted the maximum Schedule E losses permitted by the passive loss limitation of sec. 469, and, therefore, allowing any part of petitioners' Schedule C expenses to be deducted on Schedule E will not produce any additional deductible losses in 1990 and 1991.

section 263A and must be capitalized.  The only years for which respondent argues that petitioners failed to adequately substantiate their Schedule C expenses are 1992 and 1993.  We address respondent's substantiation argument in part V.A.3. of this opinion.  In this part of the opinion, we focus only on whether petitioners must capitalize their noninterest Schedule C expenses under section 263A.

Regardless of which party bears the burden of proof on the section 263A issue, the evidence shows that petitioners were engaged during the years 1990 through and including 1993 in the rehabilitation, renovation, and retrofitting of the 5401-9 S. Broadway property.  The evidence also shows: (1) The production period with respect to that part of the property intended for use as a restaurant/nightclub facility began in approximately 1987 and continued through at least 1993; (2) as of August 1992, petitioners lacked sufficient funds to complete the retrofitting and renovation of the restaurant/nightclub facility; (3) petitioners did not operate either a nightclub facility or a restaurant for profit at any time during 1992 or 1993; and (4) any expenses petitioners substantiated and deducted on their Schedules C for 1990, 1991, 1992, and 1993, with the exception of those properly allocable to petitioners' Schedule E rental activity, were attributable to petitioners' efforts to retrofit and renovate the 5401-9 S. Broadway property for use as an

entertainment facility.

We hold, therefore, that section 263A requires petitioners to capitalize the expenses they incurred in retrofitting and renovating the 5401 S. Broadway property during the years 1990, 1991, 1992, and 1993, which they deducted on their respective income tax returns, except to the extent we conclude that certain expenses are allocable to petitioners' Schedule E rental activity or were not substantiated.

IV.  Petitioners' 1992 and 1993 Depreciation Deductions

Section 167 generally allows as a depreciation deduction a reasonable allowance for the exhaustion, and wear and tear of property used in the trade or business, or property held for the production of income.  The period for depreciation of an asset begins when the asset is placed in service and ends when the asset is retired from service.  Sec. 1.167(a)-10(b), Income Tax Regs.  An asset subject to depreciation is placed in service "when first placed in a condition or state of readiness and availability for a specially assigned function".  Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs.  As a general rule, an asset "is clearly considered as placed in service when it is acquired and put into use" in a trade or business or income-producing activity.  Piggly Wiggly S., Inc. v. Commissioner, 84 T.C. 739, 746-748 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986); see also Simonson v. United States, 752 F.2d 341, 342-343

(8th Cir. 1985).  Depreciation is not allowed on an asset acquired for a business that has not yet begun operations. Piggly Wiggly S., Inc. v. Commissioner, supra at 745.

    A.  5401-9 S. Broadway Property Depreciation Expenses

    The 5401-9 S. Broadway property building has a total floor area of approximately 27,000 square feet, or 13,500 square feet per floor.  For 1992 and 1993, petitioners' accountant calculated depreciation deductions with respect to the entire building.  The parties, however, have stipulated for purposes of this case that, from 1990 through 1993, the second floor of the building was still under construction and that no business or rental activity was conducted there during 1992 and 1993.

    Although petitioners contend that the entire first floor at one time had been held out by petitioner for rent, by the end of 1990, petitioner had decided to convert and use a space of approximately 6,000 square foot as a Bluesroom.  Neither the Bluesroom nor the 5-4 Ballroom was used by petitioners in a Schedule C trade or business or in a Schedule E rental activity during 1992 or 1993.

    Respondent concedes that 25 percent of the building was used for rental purposes during 1991, 1992, and 1993.  We consider respondent's estimate of the portion of the building petitioner used for rental purposes to be reasonable.  Together, the 5-4 Ballroom and the Bluesroom (which petitioner had removed from

rental use) represent just over 72 percent of the building's total floor area (13,500 square feet plus 6,000 square feet, all divided by 27,000 square feet). Some use of the first floor common areas and restroom facilities in connection with the Bluesroom must also be taken into account. Petitioners have failed to show that more than 25 percent of the building was used for rental purposes. We hold, therefore, that petitioners, subject to the passive loss restriction of section 469, are entitled to deduct depreciation expenses for 1992 and 1993 under section 167 with respect to only 25 percent of the building.

B. 5415 S. Broadway Property Depreciation Expenses

Petitioners failed to introduce evidence regarding their alleged rental activity at the 5415 S. Broadway property. Petitioners also failed to describe the nature and type of property that they held and were depreciating. Consequently, we sustain respondent's determinations, in the notices of deficiency, disallowing the Schedule E depreciation expenses petitioners claimed with respect to the 5415 S. Broadway property for 1992 and 1993. Rule 142(a).

V. Substantiation of Petitioners' Other Schedules C and E Expenses For 1992 and 1993

A. 5401-9 S. Broadway Property

1. Gardening/Repairs and Maintenance Expenses

On their Schedule E for 1992, petitioners deducted $475 of gardening expense and did not claim any expenses for repairs and

maintenance.  On their Schedule E for 1993, petitioners did not claim any expenses for gardening, or repairs and maintenance. However, on their Schedules C for 1992 and 1993, petitioners deducted repairs and maintenance expenses of $2,700 and $4,964 respectively.

At trial, the parties stipulated the admissibility of a written statement from Billy Diamond, who confirmed that he was paid $3,400 annually from 1992 through 1994 to perform general maintenance and repair work and to water plants.  We find facts accordingly.  As limited by respondent's concession, we hold that petitioners are entitled to deduct the amounts paid to Mr. Diamond for 1992 and 1993, subject to the passive loss limitation of section 469.

### 2. Schedule E Legal Expense

On their Schedule E for 1993, petitioners reported barter income of $18,000 and a corresponding deduction of $18,000 for the value of legal services furnished to them in lieu of rent. On brief, respondent notes that, although the notice of deficiency for 1993 allowed a deduction for only 6 percent of the $18,000 legal expense that petitioners claimed on Schedule E, no adjustment was made to the corresponding $18,000 of rental income petitioner reported under his barter arrangement with that same attorney.  Respondent now concedes that, if and to the extent we find the legal services the attorney performed were worth

$18,000, petitioners are entitled to deduct this legal expense, subject to the passive loss limitation of section 469.

The attorney testified that she represented petitioner on numerous legal matters, including in the South Coast Thrift loan litigation. We find that petitioners reasonably estimated the value of the legal services attributable to petitioners' rental activity to be $18,000. We hold that, as limited by respondent's concession, petitioners are entitled to deduct this legal expense of $18,000, subject to the passive loss limitation of section 469.

### 3. Other Schedule C Expenses

Petitioners contend their accountant, at some point, possessed receipts and other documents fully substantiating all their 1992 and 1993 Schedule C expense deductions. However, neither petitioners nor their accountant introduced documentation or testimony at trial to substantiate many of the deductions claimed. For example, no checks for property tax payments were introduced, even though the accountant testified that he, at one time, had the canceled checks. The only other documents introduced in evidence to document petitioners' Schedule C expenses were a letter from Heitz Insurance Agency documenting some, but not all, of the insurance expenses deducted for 1993, two invoices from Pickney Electric Co., which were partly illegible but appeared to relate to electrical work done as part

of the renovation of the 5-4 Ballroom, a letter from Joan M. Miller, confirming petitioners' payment of $5,888 of chapter 11 bankruptcy costs in 1993,[18] and a statement from Rafael Rosario acknowledging that he was paid $3,000 for "carpentry, painting, and electrical work" at the 5401-9 S. Broadway property. Neither petitioners nor their accountant offered any satisfactory explanation as to why additional documentation was not provided.

Although petitioners did not introduce substantiation to fully document all the Schedule C expenses they claimed for 1992 and 1993, petitioners did substantiate some expenses. In addition, we are convinced from our review of all the evidence that petitioners incurred and paid at least some of the claimed expenses for which documentation has not been provided. Unfortunately, with respect to most of the undocumented expenses, petitioners did not provide any factual record from which we might estimate the expenses they paid. See Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Therefore, using our best judgment and bearing heavily against petitioners because this inexactitude is of their own making, Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), we find that the following expenses have either been documented or are allowable under Cohan with respect to the 5401-9 S. Broadway property as follows:

---

[18]Petitioners did not offer any explanation of why they claimed the bankruptcy costs were deductible.

(1)  1992

| Expense | Claimed | Documented | Allowed per Cohan | Disallowed |
|---------|---------|------------|-------------------|------------|
| Insurance | $9,200 | -0- | $6,140 | $3,060 |
| Legal/prof. | 1,400 | -0- | -0- | 1,400 |
| Repairs | 2,700 | -0- | -0- | 2,700 |
| Taxes/ licenses | 4,837 | -0- | 4,837 | -0- |

(2)  1993

| Expense | Claimed | Documented | Allowed per Cohan | Disallowed |
|---------|---------|------------|-------------------|------------|
| Insurance | $11,200 | $6,140 | -0- | $5,060 |
| Legal/prof. | 5,000 | -0- | -0- | 5,000 |
| Repairs | 4,964 | -0- | -0- | 4,964 |
| Taxes/ licenses | 4,191 | -0- | $4,191 | -0- |
| Utilities | 271 | -0- | 271 | -0- |
| Alarm sys. | 300 | -0- | -0- | 300 |
| Appraisals | 3,000 | -0- | -0- | 3,000 |
| Locksmith | 53 | -0- | -0- | 53 |
| Permits | 275 | -0- | -0- | 275 |

Consistent with respondent's concession, we hold that 25 percent of the allowable Schedule C expenses is allocable to petitioner's rental activity with respect to the 5401-9 S. Broadway property and is deductible as Schedule E expenses pursuant to section 212(2), subject to the passive loss limitation of section 469.

B. <u>5415 S. Broadway Property</u>

As indicated previously, petitioners offered almost no evidence concerning their purported rental activity involving the 5415 S. Broadway property.  In addition, petitioners failed to substantiate certain rental expenses that respondent had disallowed.  Consequently, we sustain respondent's determinations for 1992 and 1993 with respect to that property.  Rule 142(a)(1).

C. <u>Prior Year Disallowed Passive Losses</u>

Petitioners have failed to establish that they are entitled to deduct prior year unallowed passive losses of $1,345.  Consequently, we sustain respondent's determination disallowing their deduction for 1993 of prior year passive losses.  Rule 142(a).

VI.  <u>1992 and 1993 NOL Deductions</u>

Petitioners claimed NOL deductions for 1992 and 1993 on the basis of certain NOL carryforwards that petitioners had computed from 1990 and 1991.  The 1990 and 1991 NOL carryforwards they had computed arose from Schedule C expenses they deducted with respect to their purported nightclub/restaurant business at the 5401-9 S. Broadway property.  As discussed <u>supra</u> in part II, petitioners had not opened and did not operate any restaurant or nightclub on the property during 1990 and 1991.  In addition, nearly all the 1990 and 1991 Schedule C expenses were direct and indirect costs of producing petitioner's nightclub/restaurant

property, which must be capitalized under section 263A. Because petitioners did not incur the NOLs they had reported for 1990 and 1991, we hold that petitioners are not entitled to claim NOL carryforward deductions for 1992 and 1993.

VII. Accuracy-related Penalties

Respondent determined that petitioners were liable for accuracy-related penalties under section 6662(a) and (b)(1), for 1992 and 1993, for negligence with respect to their entire underpayment for each year.

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6662(c). However, section 6664(c)(1) provides that a penalty under section 6662 will not be imposed on any portion of an underpayment if the taxpayer shows reasonable cause for such portion of the underpayment and that the taxpayer acted in good faith with respect to such portion. Reliance on the advice of a professional, such as a certified public accountant, may constitute a showing of reasonable cause if, under all the facts and circumstances, such reliance is reasonable and the taxpayer acted in good faith. Henry v. Commissioner, 170 F.3d 1217, 1219-1223 (9th Cir. 1999), affg. in part and revg. in part T.C. Memo. 1997-29; Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; sec. 1.6664-4(b)(1), (c), Income Tax Regs. To prove reasonable cause,

a taxpayer must show that he reasonably relied in good faith upon a qualified adviser after full disclosure of all necessary and relevant facts. Collins v. Commissioner, 857 F.2d 1383, 1386, (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; sec. 1.6664-4(b)(1), Income Tax Regs.

Applying these principles to this case, we conclude that petitioners have sustained their burden of establishing that they had reasonable cause for: (1) Their claimed 1992 and 1993 Schedule C deductions from the 5401-9 S. Broadway property; (2) their claimed 1992 and 1993 Schedule E deductions from that property; and (3) their claimed NOL deductions for 1992 and 1993. Petitioners engaged the services of William D. Collins, C.P.A., to prepare their 1992 and 1993 income tax returns. Mr. Collins had prepared petitioners' returns since 1968 and was familiar with petitioner's activities involving the 5401-9 S. Broadway property. Petitioners provided Mr. Collins with all the information relevant to the proper tax treatment of the foregoing items.

Mr. Collins testified that, around 1987, a fictitious business name statement was filed for the "5-4 Louisiana Creole/Cajun Restaurant" that petitioner planned to operate at the 5401-9 S. Broadway property, and petitioners obtained an SBA loan. Mr. Collins also testified that, after petitioners received the SBA loan in 1987, he concluded that the interest

expense from the SBA loan and later for the South Coast Thrift loan should be reported and deducted on Schedule C to petitioners' tax return because the SBA and South Coast Thrift loans were "business loans". Mr. Collins concluded that petitioner commenced conducting an active business at the 5401-9 S. Broadway property during 1992 because the property was used for performances and events. Mr. Collins also concluded that section 263A was not applicable to petitioner's "fixing up" of the building prior to 1992. In preparing petitioners' 1990 through 1993 returns, Mr. Collins concluded section 195 permitted petitioners to deduct currently the interest, real property taxes, and other expenses petitioners paid with respect to the 5401-9 S. Broadway property.[19]

The characterization of various costs relating to petitioner's rehabilitation and improvement of the 5401-9 S. Broadway building as deductible Schedule C expenses involves analyzing and applying a technical area of tax law. Thus, it is reasonable for a taxpayer to consult and rely on a certified public accountant in determining how to treat such costs. Petitioners relied upon Mr. Collins, their certified public accountant, to determine the proper characterization and deduction of these costs, and they furnished information to Mr.

---

[19]Under sec. 195(c), interest, taxes and certain research and experimental expenditures are excluded from the definition of startup expenditures.

Collins to enable him to do so.  We find that petitioners'
reliance upon Mr. Collins, who characterized the costs incurred
for 1990 through 1993 in renovating 5401-9 S. Broadway as
Schedule C deductions, was reasonable.  We hold that petitioners
are not liable for section 6662(a) accuracy-related penalties for
1992 and 1993 with respect to that part of the underpayments
attributable to the deduction of these costs as Schedule C
expenses.  See Test v. Commissioner, T.C. Memo. 2000-362; Koenig
v. Commissioner, T.C. Memo. 1998-215, affd. without published
opinion 221 F.3d 1348 (9th Cir. 2000).

Similarly, in computing petitioners' NOL carryover from
1990, Mr. Collins misapplied and misinterpreted section 172(b).
Mr. Collins carried forward the entire 1990 NOL, without having
petitioners elect to relinquish the carryback period, because he
misunderstood the NOL carryback rules.  Cf. sec. 172(b)(3)(C);
Young v. Commissioner, 83 T.C. 831, 840-842 (1984) (holding
taxpayer failed to make a timely election to relinquish the 3-
year carryback period), affd. 783 F.2d 1201, 1204-1207 (5th Cir.
1986); Diesel Performance, Inc. v. Commissioner, T.C. Memo. 1999-
302 (same), affd. 16 Fed. Appx. 718 (9th Cir. 2001).  Petitioners
clearly relied upon Mr. Collins to compute properly their NOL
carryover from 1990.  We find that petitioners' reliance on Mr.
Collins was reasonable, and we hold that petitioners are not
liable for a section 6662(a) accuracy-related penalty for 1992

with respect to that part of the underpayment resulting from respondent's NOL carryforward adjustment.

As to petitioners' disallowed 1992 and 1993 depreciation expenses from the 5401-9 S. Broadway property, the record reflects that Mr. Collins visited the property many times over the years, was familiar with the configuration of the building, and was aware that not all the building was being used for rental purposes by petitioner during 1992 and 1993. Nevertheless, Mr. Collins computed depreciation with respect to 5401-9 S. Broadway for 1993 and prior years by taking into account the entire building. When questioned about this inconsistency, Mr. Collins explained that the entire property, at one time, had been available for rental.

In addition, although some of petitioners' claimed Schedules C and E expenses for 1992 and 1993 from the 5401-9 S. Broadway property were not substantiated at trial, Mr. Collins testified that petitioners had receipts and documents substantiating all these claimed expenses.

We are satisfied that petitioners relied upon their accountant to compute their annual depreciation expenses and to decide whether the expenses claimed on their Schedules C and E from the 5401-9 S. Broadway property were deductible. In light of petitioners' lack of tax training and their attempts to obtain competent professional help, we are also satisfied that

petitioners' reliance on their accountant was reasonable.  We hold, therefore, that petitioners are not liable for section 6662(a) accuracy-related penalties for 1992 and 1993 with respect to that part of the underpayments attributable to the disallowed depreciation and Schedules C and E expenses claimed with respect to the 5401-9 S. Broadway property.

We reach a different conclusion, however, with respect to the 5415 S. Broadway property.  Petitioners presented scant information regarding their purported rental activity at the 5415 S. Broadway property, and they did not attempt to substantiate their Schedule E expenses claimed with respect to that property for 1992 and 1993.  Petitioners have failed to establish that they acted reasonably and in good faith in deducting the Schedule E expenses from that property.  Consequently, we sustain respondent's determinations that petitioners are liable for the section 6662(a) accuracy-related penalties for 1992 and 1993 with respect to that part of the underpayments attributable to the disallowed expenses petitioners deducted with respect to the 5415 S. Broadway property.  Rule 142(a).

Petitioners also failed to prove that they acted reasonably and in good faith in deducting on their 1993 return a prior year unallowed passive loss of $1,345.[20]  Consequently, we sustain

---

[20]Petitioners did not offer any evidence to explain the source of the prior year passive loss or why they claimed they
(continued...)

respondent's determination that petitioners are liable for the section 6662(a) accuracy-related penalty for 1993 with respect to that part of underpayment attributable to their deduction of a prior year's unallowed passive loss.  Rule 142(a).

In light of the foregoing and to reflect concessions made by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[20](...continued)
had reasonable cause for their deduction of the loss.  Because petitioners made no credible attempt to explain the loss, or to justify their deduction of it, we reject petitioners' argument that the penalty should not apply to respondent's adjustment disallowing the loss.